JUDGE DANIELS

25 CV 06291

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Civil Division

| | |
|---|---|
| **CAROLINE SHU,** | ) |
| *Plaintiff,* | ) |
| v. | ) |
| **AMAZON.COM, INC.,**<br>**410 Terry Avenue N,**<br>**Seattle, WA 98109,** | ) Civil Action No.: _____ |
| Serve Registered Agent: | ) |
| **Corporation Service Company,**<br>**300 Deschutes Way SW**<br>**Suite 208 MC-csc1**<br>**Tumwater, WA 98501,** | ) **JURY TRIAL DEMANDED** |
| *Defendant* | ) |

U.S. DISTRICT COURT FILED JUL 31 2025 S.D. OF N.Y.

## COMPLAINT FOR EQUITABLE AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Caroline Shu files this complaint and demand for jury trial against Defendant Amazon.com, Inc. ("Amazon") for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), the New York Human Rights Law, NY Exec. L. § 296 ("NYHRL"), and the Family Medical Leave Act of 1993, 29 U.S.C. 2601 *et seq.* ("FMLA")[1].

### JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28

---

[1] Plaintiff hereby notifies the Court that this complaint was prepared with the assistance of legal counsel.

U.S.C. § 1332 because this is an action arising under the laws of the United States, specifically the ADA and FMLA, and the parties are diverse.

2. This Court has personal jurisdiction over Amazon because it conducts significant business in this judicial district.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because all or a substantial portion of the unlawful employment practices occurred within this judicial district.

## PARTIES

4. Plaintiff is a United States citizen and is domiciled in Jersey City, New Jersey.

5. Defendant is headquartered in Seattle, Washington, and conducts significant business in this district at its location Amazon JFK14, located at 7 W 34th Street, New York, New York 12590.

## ADMINISTRATIVE EXHAUSTION

6. Shu has complied with all the administrative prerequisites necessary to bring this action.

7. On or about April 8, 2025, Shu filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

8. On or about May 5, 2025, Shu amended her charge of discrimination.

9. On or about May 6, 2025, the EEOC issued a right to sue notice to Shu.

## FACTUAL ALLEGATIONS

10. Amazon hired Shu on or about April 7, 2014, as a vendor manager for its Quidsi division. Shu worked from New Jersey in this role.

11. Amazon promoted Shu from a level ("L") 4 position to a L5 between 2014 and 2017.

12. Shu transitioned as a vendor manager to the Amazon Grocery team in or around 2017. Shu relocated from New Jersey to Seattle, WA for this position.

13. Shu transitioned to the Amazon Assistant team as a product marketing manager in or around July 2018. In or around 2020 Amazon promoted Shu from L5 to L6. Shu remained with Amazon Assistant based out of Seattle, WA until in or about June of 2021.

14. Shu joined the Amazon Live team based in New York City as a senior product marketing manager in or around July of 2021. In or about January of 2022 Shu relocated from Seattle, WA to Brooklyn, NY for this role and commuted from Brooklyn to the Amazon JFK14 location for her work.

15. Shu received positive performance reviews and had good professional relationships with her supervisors and colleagues from in or around 2014 through in or around 2021.

16. Shu reported on the Amazon Live team to L6 manager Molly Balestrino, who had worked for Amazon Live for three years.

17. Shu experienced frustration, hostility, and bullying from Balestrino and her colleagues immediately upon joining Amazon Live.

18. Shu often overheard colleagues talking about Shu and calling her names, including comments that Shu was "crazy" and "bitchy."

19. Balestrino frequently gave Shu unclear guidance and instructions on Shu's work projects and micromanaged Shu's work. Balestrino often asked Shu to redo work because

Balestrino's desires and instructions changed part-way through the project.

20.     One of Shu's major responsibilities was to understand viewer live stream behavior for Amazon Live promotional events, then leverage the data obtained to increase viewership and participant interaction during future events.

21.     Shu created multiple documents and protocols outlining data, observations, and suggested processes for future events, and Balestrino frequently nitpicked Shu's work, going so far as to challenge simple word choices without feedback on what language Balestrino preferred.

22.     Balestrino did not provide any guidance when Shu asked for clear direction as to Balestrino's preferred language or format or how to otherwise improve her work product. As a result, Shu had difficulty learning her role and meeting Balestrino's expectations as Balestrino's wishes changed day to day.

23.     Shu had had no difficulties in any of her prior roles at Amazon in learning the job responsibilities, meeting manager's expectations, or otherwise completing the work. Shu became concerned for her mental health as she experienced stress and anxiety in reporting to Balestrino and sought medical intervention through therapy.

24.     Shu's medical provider diagnosed Shu with attention-deficit/hyperactive disorder ("ADHD") and prescribed Shu medication to manage her condition in or around October of 2021.

25.     Shu attended a meeting with Balestrino that same month wherein Balestrino commented that Balestrino expected Shu to learn her role faster as an L6 manager. Shu disclosed her medical diagnosis to Balestrino, and Balestrino responded to Shu something

to the effect of, "Well, you better make sure your work still gets done."

26. Balestrino did not offer any contact information for Amazon's human resources department, employee assistance program, or any other internal resources related to Shu's medical diagnosis.

27. Shu began working longer hours thereafter, averaging around 60 hours per week, out of fear of losing her job or Balestrino assigning Shu to a Focus plan, Amazon's version of a performance improvement plan.

28. Around the same time, Balestrino asked Shu to reformat a comprehensive protocol document for Amazon Live product festivals that Balestrino would be presenting to L8 Director Meredith Silver. Balestrino claimed Shu's format was not what Silver would want. Balestrino planned to use this protocol and Shu's work in part to support Balestrino's promotional attempts to ascend from L6 to L7.

29. Shu complied with Balestrino's request to reformat the document and Balestrino presented the document to Silver who then admonished Shu for the document's format as it was not what she had expected or wanted for the protocol. Balestrino refused to take accountability for having asked Shu to reformat the document.

30. Amazon promoted Balestrino to L7 in or around the first quarter of 2022, and Balestrino issued Shu's performance review in 2022, rating Shu as meeting Amazon's expectations. Thereafter, Balestrino began avoiding Shu by arriving late to scheduled meetings or missing them altogether without notice. Balestrino often skipped meetings with Shu and other Amazon stakeholders for which Shu needed Balestrino's support as an L7 manager.

31.     Amazon reassigned Shu to report to L7 manager Julie Haleluk in or around July of 2022. Shu and Haleluk had a positive professional relationship and Haleluk told Shu that she (Haleluk) was impressed by Shu's work. Haleluk hired additional staff to support Shu.

32.     Amazon reassigned Shu to report to L8 manager Stacey Rosenson in or around September of 2022.

33.     Shu advocated for her own promotion from L6 to L7 while reporting to Rosenson, and Rosenson told Shu that such a promotion was impossible for Shu.

34.     Rosenson initiated a reorganization of personnel in or around February of 2023 and assigned Shu to report to L6 manager John Mannhart, the same professional level as Shu. Shu was the only employee subject to the reorganization.

35.     Shu was continuing to work more than 60 hours per week and push her projects forward, and Mannhart issued Shu's performance review in 2023 rating Shu as meeting Amazon's expectations.

36.     Shu reported to work on or about April 27, 2023, but began to feel mentally unwell due to the long hours, stress, and a sense of overwhelm by her workload. Accordingly, Shu informed Mannhart that she would take a sick day on April 28, 2023, to rest and recuperate.

37.     Within an hour of notifying Mannhart that she intended to take a sick day, human resources representative Julia Yi contacted Shu inquiring into Shu's wellbeing. Yi claimed she had received a report from a colleague that Shu seemed strange while in the office. Shu informed Yi that she would follow-up with Yi on or about May 1, 2023.

38. On or about April 28, 2023, Shu used a day of sick leave. Shu's partner transported Shu to her sister's house in New Jersey to rest and recuperate with family. While Shu stayed in New Jersey, her partner returned to their home in Brooklyn.

39. Amazon sent New York Police Department ("NYPD") officers to Shu's home in Brooklyn to conduct welfare checks every 12 hours on or about April 29 and April 30, 2023. NYPD officers spoke with Shu's partner who told officers that Shu was not at home. The officers never told Shu's partner why they needed to speak with Shu.

40. At the same time, Yi attempted to contact Shu's sister and left voicemails asking for information about Shu. Yi never left callback or contact information and Shu's sister was unable to return Yi's calls.

41. Shu contacted Yi on or about April 30, 2023. Yi again told Shu that someone had reported that Shu had seemed strange on or about April 27, 2023. Shu asked who had made the report, but Yi refused to disclose the reporter's name.

42. Shu met telephonically with human resources representatives Leona Velez and Yi, and L10 Vice President Wayne Purboo approximately two weeks after her sick leave and the NYPD visits. Shu told Velez, Yi, and Purboo that the NYPD visits felt like Amazon was stalking and harassing her and detailed the previous 18 months Shu had spent with Amazon Live. Shu reported that she was bullied by colleagues and discriminated against by Balestrino.

43. Yi asked Shu what Shu wanted to do, to which Shu requested paid time off. Human resources thereafter arranged for Shu to take medical leave from in or around May of 2023 through in or around September of 2023.

44.     Shu was further diagnosed with acute stress disorder, major depressive disorder, and anxiety while on medical leave, and Shu was also diagnosed with post-traumatic stress disorder ("PTSD") in late 2023.

45.     While Shu was on medical leave, Haleluk became her second-line, or skip-level, supervisor. Mannhart remained Shu's first-line supervisor.

46.     Shu returned to work in or around September of 2023 and filed a complaint of disability discrimination with human resources against Balestrino for failing to provide resources following Shu's disclosure of her original ADHD diagnosis.

47.     Mannhart and Haleluk began treating Shu differently upon her return to work and remained distant in their interactions with Shu after.

48.     Amazon Live changed Shu's job responsibilities and ended its shopping festival program. Colleagues were surprised that Amazon ended the program as it had been doing well and asked Shu what happened. Shu was never told why Amazon cut the festival program.

49.     Mannhart tasked Shu with new work that involved building a strategy for a new visual series and creating the foundation for a content marketing program. Shu had never done this work before, and the initiative was new for Amazon Live. Shu needed other peers and teams to complete various components of the work in order for Shu to establish the visual series and marketing program, but Shu had no authority or control over the other peers or teams.

50.     In or around November of 2023, human resources closed its investigation into Shu's complaint against Balestrino and issued its determination that Balestrino had not

violated Amazon policies or standards. Thereafter Mannhart issued Shu's performance review in or around early 2024 and rated Shu as falling below Amazon's expectations.

51. Mannhart assigned Shu to a Focus (performance improvement) plan on or around February 22, 2024, stating Shu needed to improve on thinking big and earning trust. Mannhart provided multiple tactical goals for Shu to accomplish by April 16, 2024.

52. Shu was ineligible to apply for a transfer to any other Amazon team while on the Focus, and Shu successfully completed all the Focus goals during the evaluation period.

53. Nevertheless, Mannhart informed Shu on or about April 8, 2024, that he was extending her Focus period through May 17, 2024. Mannhart acknowledged that Shu had successfully launched the Amazon Content Marketing program but then outlined new performance goals for Shu to complete during the extended period. Again, Shu successfully completed all Focus goals during the evaluation.

54. Mannhart provided no further follow-up on or around May 17, 2024, despite multiple emails from Shu asking for guidance and information on her next steps.

55. Mannhart informed Shu that her Focus was being extended for a second time on or about June 3, 2024, claiming that the prior Focus goals had been too tactical and that Shu needed to be evaluated against strategic goals.

56. Shu asked Mannhart who was overseeing the Focus, as Amazon typically does not extend a Focus. Mannhart confirmed Haleluk and Yi were leading Shu's Focus.

57. Yi was aware of Shu's medical diagnosis due to her disclosures in May 2023 to Yi, Velez, and Purboo, and Mannhart and Haleluk were aware of Shu's medical condition as a result of Shu's medical leave.

58. Shu told Mannhart that her Focus felt like a constantly moving target and that she was being set up to fail because the goals were impossible to meet.

59. Shu had no alternative but to submit her resignation on June 18, 2024, and Amazon effectively terminated her employment on or about June 28, 2025.

60. Shu has suffered mental anguish and economic damages as the result of Defendant's illegal actions, and she will continue to sustain damages into the future.

## COUNT I
### Discrimination Based on Disability
### in Violation of the Americans with Disabilities Act
### 42 U.S.C. § 12101 *et seq.*

61. Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

62. Defendant unlawfully discriminated against Plaintiff on the basis of her disability.

63. The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* makes it unlawful for an employer to discriminate against any individual with respect to her terms, conditions, or privileges of employment because of her disability.

64. Plaintiff is a disabled individual under the ADA. Her attention deficit/ hyperactivity disorder, acute stress disorder, major depressive disorder, anxiety, and post-traumatic stress disorder impact several aspects of her daily life.

65. Plaintiff is a qualified individual under the meaning of the statute. She worked for the Defendant from 2014 through 2024 and earned positive performance reviews from 2015 through 2023.

66. Defendant discriminated against Plaintiff and treated her differently than non-

disabled employees when it changed her job duties while she was on medical leave and then assigned her to a performance improvement plan in or around February 2024 and extended the performance improvement plan twice while changing Plaintiff's performance goals with each plan.

67. Defendant further discrimination against Plaintiff and treated her differently than non-disabled employees when it assigned Mannhart, Haleluk, and Yi—all of whom had knowledge of Plaintiff's medical condition—to oversee Plaintiff's performance improvement plan.

68. Defendant further discriminated against Plaintiff when it constructively terminated her on or about June 28, 2024.

69. Any asserted reason for this mistreatment is illegitimate pretext for unlawful discrimination.

70. As a result of Defendant's violations of the ADA, Plaintiff has suffered and is continuing to suffer injuries.

## COUNT II
### Discrimination Based on Disability
### in Violation of the New York Human Rights Law
### NY Exec. L. § 296

71. Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

72. Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

73. Defendant is an "employer" as defined by NY Exec. L. § 292(5).

74. Plaintiff is an "employee" as defined by NY Exec. L. § 292(6).

75. Defendant unlawfully discriminated against Plaintiff on the basis of her disability.

76. The New York Human Rights Law, NY Exec. L. § 296, makes it unlawful for an employer to discriminate against any individual with respect to her terms, conditions, or privileges of employment because of her disability.

77. Plaintiff is a disabled individual under the NY HRL NY Exec. L. § 292(21). Her attention deficit/hyperactivity disorder, acute stress disorder, major depressive disorder, anxiety, and post-traumatic stress disorder impact several aspects of her daily life.

78. Plaintiff is a qualified individual under the meaning of the statute. She worked for the Defendant from 2014 through 2024 and earned positive performance reviews from 2015 through 2023.

79. Defendant discriminated against Plaintiff and treated her differently than non-disabled employees when it changed her job duties while she was on medical leave and then assigned her to a performance improvement plan in or around February 2024 and extended the performance improvement plan twice while changing Plaintiff's performance goals with each plan.

80. Defendant further discrimination against Plaintiff and treated her differently than non-disabled employees when it assigned Mannhart, Haleluk, and Yi—all of whom had knowledge of Plaintiff's medical condition—to oversee Plaintiff's performance improvement plan.

81. Defendant further discriminated against Plaintiff when it constructively terminated her on or about June 28, 2024.

82. Any asserted reason for this mistreatment is illegitimate pretext for unlawful discrimination.

83. As a result of Defendant's violations of the New York Human Rights Law, Plaintiff has suffered and is continuing to suffer injuries.

**COUNT III**
**Retaliation in Violation of**
**The Family and Medical Leave Act** of 1993
**29 U.S.C. 2601** *et seq.*

84. Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

85. At all times relevant to this complaint, Plaintiff was a "person" and an "employee" as defined by 29 U.S.C. § 2611(2)(A).

86. At all times relevant to this complaint, Defendant was an "employer" as defined by 29 U.S.C. § 2611(4)(A). During all relevant times, Defendant controlled the terms and conditions of Plaintiff's employment.

87. Plaintiff participated in protected activity from April 2023 to September 2023 when she took medical leave to treat her disabilities.

88. Plaintiff suffered an adverse action on June 28, 2024, when Defendant illegally terminated her employment.

89. A causal connection exists between Plaintiff's protected activity and her termination, as evidenced by the fact that Defendant changed Plaintiff's job responsibilities while she was on medical leave to types of work Plaintiff had never completed, then assigned Plaintiff to a performance improvement plan in or around

February 2024 and extended the performance improvement plan twice while changing Plaintiff's performance goals with each plan. Plaintiff's performance improvement plan was overseen by three employees who had knowledge of Plaintiff's medical condition and use of medical leave. Defendant's regular changes to Plaintiff's performance improvement plan resulted in Plaintiff's unlawful termination.

90. Adverse actions were taken against Plaintiff, in whole or in part, because she exercised her rights under the FMLA and she engaged in protected activity.

91. Defendant's stated reasons for terminating Plaintiff are pretextual.

92. Plaintiff sustained and is continuing to sustain damages as the result of the Defendant's illegal actions in violation of the FMLA. Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment in her favor and award her the following relief:

a) Judgment against Defendant in an amount of any wages, salary, employment benefits, or other compensation denied or lost to Shu, including economic damages, liquidated damages, compensatory and punitive damages to be determined at trial;

b) Re-employment, reinstatement, promotion, front pay, or other equitable relief;

c) Pre-judgment interest;

d) Interest due on unpaid wages;

e) A reasonable attorney's fee and costs of this litigation;

f)  Injunctive and declaratory relief; and

g)  Reasonable expert witness fees;

h)  Any other relief that this Honorable Court deems just and proper to award

## JURY DEMAND

Plaintiff requests a trial before a jury for any and all issues to be so tried.

Respectfully submitted,

Caroline Shu
295 Johnston Ave.
Apt. 511
Jersey City, NJ 07304
(609) 558-7321
*Plaintiff*